**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

          - v –

                    S1 12 Cr. 556 (LTS)

ANIBAL SOTO, and
ANIBAL RAMOS,
              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE INDICTMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

I.   The Federal Kidnapping Act, as Amended by the Adam Walsh Child Protection and Safety Act of 2006, Unconstitutionally Exceeds Congress's Authority to Regulate Intrastate Activity Under the Commerce Clause. ..................................................3

   A.   History of Federal Kidnapping Statute Does Not Reveal Congressional Concern With Effects of Purely Intrastate Kidnappings on Interstate Commerce. ....................3

   B.   Congress Cannot Regulate Intrastate Violent Crime Without Showing That It Has a Substantial Effect on Interstate Commerce. .........................................5

   C.   Amended Federal Kidnapping Act Is Not Valid as an Exercise of Congress's Power to Regulate Violence Directed at an Instrumentality of Interstate Commerce. ...............................................................................................7

   D.   Federalization of Kidnapping Law Would Upset the Federal-State Balance. ...........10

II.  Federal Kidnapping Statute is Unconstitutional as Applied to the Defendants' Alleged Conduct Where Any Alleged Use of an Instrumentality of Interstate Commerce Was Too Attenuated to Confer Federal Jurisdiction. .......................................10

   A.   Car Driven for Non-Commercial Intrastate Use Is Not an "Instrumentality" of Interstate Commerce.................................................................................11

   B.   The "Use" of Any Purported Instrumentality of Interstate Commerce Was Too Attenuated From the Alleged Kidnapping to Create a Nexus to Interstate Commerce. ...............................................................................13

III. Count Three Cannot Stand Without Count Two................................................................17

CONCLUSION.................................................................................................................17

Defendants Anibal Soto and Anibal Ramos, pursuant to Federal Rule of Criminal Procedure 12(b)(3), as well as Article 1, Section 8, Clause 3 and the Tenth Amendment to the United States Constitution, respectfully move for entry of an order dismissing Counts One and Two of the superseding indictment filed on August 31, 2012 (the "Indictment"). The Indictment charges Mr. Soto and Mr. Ramos with kidnapping conspiracy (Count One) and kidnapping (Count Two) in violation of 18 U.S.C. §§ 1201 and 2, and with the use of a firearm in furtherance of a kidnapping (Count Three) in violation of 18 U.S.C. § 924(c). The alleged kidnapping occurred entirely within the state of New York and had no nexus with interstate commerce. Prosecution of these claims exceeds the federal government's power under the Commerce Clause.

## PRELIMINARY STATEMENT

The federal government seeks to prosecute Mr. Soto and Mr. Ramos for an alleged kidnapping that — as the Indictment admits — occurred *entirely* within the state of New York. The defendants reside in New York, the alleged victim resides in New York, the alleged kidnapping occurred only in New York and at no point during the alleged kidnapping is either defendant alleged to have left New York. Kidnapping is just the sort of common law crime that has always been within the province of the police powers of the states, and the State of New York can prosecute this alleged kidnapping under New York law. (In fact, charges were initially brought by the Bronx County District Attorney's Office.) But instead, the federal government is using an overly aggressive reading of an amendment to the Federal Kidnapping Act to make this ordinary local crime an extraordinary federal offense, claiming that the defendants "use[d] a means, facility, and instrumentality of interstate commerce in committing and in furtherance of the commission of the kidnaping."

From reading the Indictment, the instrumentality of interstate commerce alleged appears to be a "vehicle":

> a. On or about July 2, 2012**, in the vicinity of 801 Hunts Point Avenue, Bronx, New York**, ANIBAL RAMOS, the defendant, and others not named as defendants herein, assaulted an individual ("Victim-1") and forced Victim-1 **into a vehicle**.

Indictment ¶ 3 (emphasis added). But the entire kidnapping is alleged to have occurred within a distance of less than *two miles*, with one of the defendants allegedly driving the victim from one point in the Bronx to another point a few blocks away. Driving a car in-state for a distance of two miles does not constitute use of an instrumentality of interstate commerce. A personal vehicle driven intrastate does not even qualify as an instrumentality of interstate commerce. And though the government has subpoenaed certain cell phone records, any alleged "use" of those cell phones was far too attenuated from the kidnapping itself to establish a connection between the alleged kidnapping and interstate commerce.

Even if the defendants drove a car or someone used a cell phone at some point during the alleged kidnapping, neither act creates the kind of substantial nexus with interstate commerce that could transform the quintessential state law crime of a local kidnapping into a federal crime. A local kidnapping of the sort alleged in this case is simply not within Congress's purview. This usurpation of state police powers in a case where any connection to interstate commerce is, at best, highly attenuated would replace our federalist system with a centralized government that regulates even the most local of crimes. The Act is therefore unconstitutional both on its face and as applied to Mr. Soto and Mr. Ramos.

I.      **The Federal Kidnapping Act, as Amended by the Adam Walsh Child Protection and Safety Act of 2006, Unconstitutionally Exceeds Congress's Authority to Regulate Intrastate Activity Under the Commerce Clause.**

   A.   **History of Federal Kidnapping Statute Does Not Reveal Congressional Concern With Effects of Purely Intrastate Kidnappings on Interstate Commerce.**

The Federal Kidnapping Act was passed in 1932 in response to an "epidemic" of kidnappings of wealthy victims who were kidnapped for ransom and taken across state lines to evade local law enforcement. *Chatwin* v. *United States*, 326 U.S. 455, 462 (1946); *see also United States* v. *Moore*, 571 F.2d 76, 83 (2d Cir. 1978).[1]  Congress designed the Federal Kidnapping Act to "*assist* the states in stamping out this growing and sinister menace of kidnapping," not to supplant the states. *Chatwin*, 326 U.S. at 462 (emphasis added). The law applied to cases "where victims were transported across state lines [and] only the federal government had the power to disregard such barriers in pursuing the captors." *Id.* The statute was drafted to cover a wide variety of kidnappings, so long as the kidnapping was "followed by interstate transportation." *Id.* The courts recognized the importance of the "interstate transportation" element and rigorously enforced it — at one point holding unconstitutional a statutory amendment that created a presumption that a kidnapping victim who had not been released within 24 hours had been transported in interstate commerce. *Moore*, 571 F.2d at 86-87.

In 2006, Congress passed the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (codified as amended in scattered sections of 18 U.S.C. and 42 U.S.C.) (the "Adam Walsh Act"). The primary achievement of the Act was to establish

---

[1] As the Supreme Court described the law's genesis: "'Law enforcement authorities, lacking coordination, with no uniform system of intercommunication and restricted in authority to activities in their own jurisdiction, found themselves laughed at by criminals bound by no such inhibitions or restrictions. The procedure was simple — a man would be kidnapped in one State and whisked into another, and still another, his captors knowing full well that the police in the jurisdiction where the crime was committed had no authority as far as the State of confinement and concealment was concerned.'" *Chatwin*, 326 U.S. at 463 (citing Fisher & McGuire, *Kidnapping and the So-called Lindbergh Law*, 12 NEW YORK U.L.Q. REV. 646, 653 (1935)). The law was commonly referred to as the "Lindbergh Law" as it was passed in the wake of the famous Lindbergh baby kidnapping. *Id.*

-3-

the National Sex Offender Registry and to make it a crime for certain sex offenders to "travel[] in interstate or foreign commerce" without first registering (this portion of the Act is referred to as the Sex Offender Registration and Notification Act, or "SORNA"). Pub. L. No. 109-248 § 2250(a), 120 Stat. 602.

Of relevance here is Section 213 of Title II of the Adam Walsh Act, which amended the Federal Kidnapping Act to include cases in which "the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." Pub. L. No. 109-248 § 213, 120 Stat. 616. This amendment sought to broaden the jurisdictional basis for kidnapping beyond the traditional nexus of crossing state lines.

Nothing in the legislative history of the Adam Walsh Act indicates that Congress was concerned about local kidnappings with only remote connections to interstate commerce, such as the involvement of a car or cell phone. Nor does the legislative history indicate that Congress had reason to upend the traditional federal-state balance in which state authorities have primary power to police local kidnappings. In fact, there is no discussion of this specific amendment in any of the legislative history. There are, however, portions of the legislative history that indicate Congress was concerned about any radical transformation of the federal-state balance in general and the erosion of local authority in particular. Congressman Robert Scott of Virginia, for example, was concerned that the federalization of traditional state sex offenses (contained in another portion of the Act) would result in high federal mandatory minimums that would supplant the carefully calibrated punishments designed by the states:

> Under the provisions of this bill, prom night in the Washington D.C., Virginia, and Maryland area could have nightmarish consequences. And to show how ridiculous it could be, if two teenagers, one 18 and one 17, engage in sexual activity without crossing a State line, you will have, if there is any prosecution at all, it will be a misdemeanor on the part

-4-

of the 18-year-old. So we have the absurd anomaly of making what is now an infrequently prosecuted misdemeanor into a 10-year mandatory minimum sentence for teens who cross state lines to do it. Imposing a 10-year mandatory prison term on teenagers engaged in consensual sex is not responsible legislating.

152 Cong. Rec. H5705-01, 66-67 (July 25, 2006) (statement of Rep. Scott).

Nothing in the Congressional Record shows that Congress was concerned about any effects local kidnappings have on interstate commerce or the incidental role that cars and cell phones might play in kidnappings.

    **B.    Congress Cannot Regulate Intrastate Violent Crime Without Showing That It Has a Substantial Effect on Interstate Commerce.**

Where — as here — Congress attempts to criminalize noneconomic intrastate activity, it must first show that the noneconomic intrastate activity "substantially affects" interstate commerce. *See United States* v. *Morrison*, 529 U.S. 598, 610 (2000) (holding that for a federal "criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms" to be constitutional, the criminal activity must have "substantially affected interstate commerce"); *United States* v. *Lopez*, 514 U.S. 549, 580 (1995) (Kennedy, J., concurring) ("[H]ere neither the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute has an evident commercial nexus."); *id.* at 584 (Thomas, J., concurring) (courts "*always* have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power"). Activities that are "intrastate in character" must have "such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions," and Congress may not regulate intrastate behavior whose "effects upon interstate commerce [are] so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is nation-

al and what is local and create a completely centralized government." *Morrison*, 529 U.S. at 608 (quoting *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)).

Intrastate kidnapping does not have a substantial effect on interstate commerce and cannot be regulated under the Commerce Clause. Kidnapping, like gun possession in *Lopez* and rape in *Morrison*, is noneconomic, local, criminal conduct. To determine whether intrastate activity has a substantial effect on interstate commerce, courts ask "whether: (1) the activity at which the statute is directed is commercial or economic in nature; (2) the statute contains an express jurisdictional element involving interstate activity that might limit its reach; (3) Congress has made specific findings regarding the effects of the prohibited activity on interstate commerce; and (4) the link between the prohibited conduct and a substantial effect on interstate commerce is attenuated." *United States* v. *Holston*, 343 F.3d 83, 87 (2d Cir. 2003) (citing *Morrison*, 529 U.S. at 610-12). Kidnapping is not commercial or economic in nature, Congress made no findings about the effects of kidnapping on interstate commerce, and any link between local kidnappings and interstate commerce is attenuated at best. *See Morrison*, 529 U.S. at 617 (Congress cannot "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce.").

The only *Morrison* factor that arguably supports the constitutionality of the federal kidnapping statute is that the statute purports to include a jurisdictional element. But the Second Circuit has discounted the importance of this factor, which can easily be "superficially met" but still not "tie criminal conduct to interstate commerce" in a way that "satisfactorily establish[es] the required 'substantial effect.'" *Holston*, 343 F.3d at 89. Here, the jurisdictional language is only a fig leaf and cannot disguise the substance of the Act, which is not a regulation of interstate commerce but a regulation of local crime.

C.  **Amended Federal Kidnapping Act Is Not Valid as an Exercise of Congress's Power to Regulate Violence Directed at an Instrumentality of Interstate Commerce.**

The Supreme Court has noted that the federal government does have the power to regulate "violence *directed at* the instrumentalities of interstate commerce, interstate markets, or things or persons in interstate commerce." *Morrison*, 529 U.S. at 609 (emphasis added); *see also id.* at 618 ("The regulation and punishment of intrastate violence that is not *directed at* the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States.") (emphasis added); *Lopez*, 514 U.S. at 558 ("Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities."). Courts sometimes refer to the regulation of the "channels" or "instrumentalities" of interstate commerce as *Lopez* "Category One" and "Category Two" regulations (as opposed to "Category Three," wherein Congress regulates activities that simply "affect" interstate commerce). *See United States* v. *Jacques*, 2011 WL 1706765, at *7 (D. Vt. May 4, 2011). Some courts have thus held that the Federal Kidnapping Act, because it purports to require the use of "the mail or any means, facility, or instrumentality of interstate or foreign commerce," automatically falls within Congress's Commerce Clause powers because Congress is "purport[ing] to regulate the channels or instrumentalities of interstate commerce." *Id.* at *7.

But the *Lopez* categories "are a guide, not a straitjacket," *United States* v. *Alderman*, 565 F.3d 641, 646-47 (9th Cir. 2009), and are simply tools used to answer the essential inquiry of whether a law is sufficiently connected to interstate commerce. *See id.* ("[W]e are not obligated to 'jam a square peg into a round hole.'"). Congress cannot escape judicial review just by using the magic word "instrumentality." Even though the Federal Kidnapping Act invokes the terms "means" and "instrumentalities," the Act "is not a regulation of the use of the channels

-7-

of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce," nor is it "a regulation by which Congress has sought to protect an instrumentality of interstate commerce or a thing in interstate commerce." *Lopez*, 514 U.S. at 559; *see also Morrison*, 529 U.S. at 612 (holding that an "express jurisdictional element" with "an explicit connection with or effect on interstate commerce . . . *may* establish that the enactment is in pursuance of Congress' regulation of interstate commerce," but that it is not dispositive (emphasis added)). Instead, like the statute in *Lopez*, it is "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561.

The *Lopez* Court never suggested that Congress could regulate local crime so long as it included the word "instrumentality" somewhere in the statute. And in *Morrison*, the Court clarified that when these so-called Category One and Category Two cases regulated violent conduct, the violence must be "*directed at* the instrumentalities of interstate commerce." *Morrison*, 529 U.S. at 609 (emphasis added). The Federal Kidnapping Act does not regulate highways or bus stations or cars traveling across state lines or telephones, and it does not regulate violent threats to those things — it regulates (as the Act says) kidnappings.

The cases that have upheld the Federal Kidnapping Act simply because it purports to regulate "instrumentalities" are not consistent with Second Circuit case law. The Second Circuit analyzes statutes that purport to regulate instrumentalities of interstate commerce to see whether they do, in fact, have a substantial connection to interstate commerce. In *United States v. Holston*, the Second Circuit analyzed the constitutionality of the federal law prohibiting the production of child pornography "using materials that have been mailed, shipped, or transported in interstate or foreign commerce." 343 F.3d 83, 84 (2d Cir. 2003). Even though that law, like

the Federal Kidnapping Act, included language about the use of an instrumentality of interstate commerce, the court held that the key question was whether "the statute regulates an activity that 'substantially affects' interstate commerce." *Id.* at 88. The court refused to rely on "the mere existence of jurisdictional language purporting to tie criminal conduct to interstate commerce [to] satisfactorily establish the required 'substantial effect,' where, as here, the interstate component underpinning the jurisdictional element, for example, the shipment of a video camera, is attenuated from the criminal conduct — the production of child pornography — which occurs entirely locally."[2] *Id.* at 89. Instead, the court relied on the fact that "the activity on the whole bears a significant relationship to interstate commerce," *id.*, because "Congress concluded that there is an extensive interstate market in child pornography and that the existence of this market depends on a distribution network that relies heavily on the mails and other instrumentalities of interstate commerce." *Id.* at 90; *see also United States* v. *Harris*, 358 F.3d 221, 222 (2d Cir. 2004) (applying "substantial effects" analysis to determine constitutionality of statute prohibiting the possession of child pornography "that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer"). In contrast, there is no interstate "market" for kidnapping and no showing that local kidnappings affect such a market.

### D. Federalization of Kidnapping Law Would Upset the Federal-State Balance.

Kidnapping, like arson, "is a paradigmatic common-law state crime." *Jones* v. *United States*, 529 U.S. 848, 858 (2000). All fifty states — including New York — have laws against kidnapping. *See* THOMSON REUTERS/WEST, 50 STATE STATUTORY SURVEYS:

---

[2] The jurisdictional language in *Holston*, like the jurisdictional language in the Federal Kidnapping Act, did not directly regulate an instrumentality of commerce, but used the incidental presence of an instrumentality of commerce to regulate the economic activity of child pornography production. *United States* v. *Giordano*, in contrast, is an example of the Second Circuit's analysis of a federal statute that the court found to be a direct regulation of an instrumentality (namely, the interstate telephone system). 442 F.3d 30, 38 (2d Cir. 2006). That statute prohibited the "transmission" of a minor's personal information "using the mail or any facility or means of interstate or foreign commerce." *Id.* The word "transmission" directly connected the instrumentality (*i.e.*, the means of transmittal) with the illegal act.

KIDNAPPING (2012), *available at* Westlaw 0030 SURVEYS 12; *see also* N.Y. PENAL LAW §§ 135.00-135.75. Prosecution of violent crimes has always fallen under the police powers of the states. *See Morrison*, 529 U.S. at 618 ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). In fact, one of the defendants here was initially charged by the state. As Justice Stevens noted in his *Jones* concurrence, the federalization of a traditional state crime will alter the states' carefully calibrated penalty decisions and "effectively displace a policy choice made by the State." *Jones*, 529 U.S. at 859 (Stevens, J., concurring). Here, where Congress did not even find that local kidnappings had any effect, substantial or otherwise, on interstate commerce, this Court should not "effectually obliterate the distinction between what is national and what is local." *Morrison*, 529 U.S. at 608.

II. **Federal Kidnapping Statute is Unconstitutional as Applied to the Defendants' Alleged Conduct Where Any Alleged Use of an Instrumentality of Interstate Commerce Was Too Attenuated to Confer Federal Jurisdiction.**

Even if the Court finds that the amended Federal Kidnapping Act could, in some cases, be applied consistently with the scope of the federal government's commerce powers, this is not such a case. There does not appear to have been any "instrumentality" of interstate commerce involved in the alleged kidnapping. And even if something that could be considered an "instrumentality" were present at the scene, any "use" was at most incidental. When a kidnapping occurs over a two-mile span in a single city in a single state, when no one crosses state lines, and when neither the safety nor utility of an instrumentality of interstate commerce has been directly threatened, the connection between a purely local crime of violence and interstate commerce is far too attenuated to justify the encroachment of federal powers on the states. If any crime occurred here, it is a New York crime that should be prosecuted under New York law by New York authorities.

### A. Car Driven for Non-Commercial Intrastate Use Is Not an "Instrumentality" of Interstate Commerce.

It is not clear whether the government is relying on the alleged use of a car to create the connection with interstate commerce, or something else. But a car driven for intrastate and non-commercial purposes does not constitute an instrumentality of interstate commerce that could justify federal regulation of an intrastate kidnapping. While it might be true that some cars *can* be instrumentalities of interstate commerce, it does not follow that *all* cars necessarily *are* instrumentalities of interstate commerce at all times.

Cars can be used for purely intrastate and purely non-commercial purposes. The fact that an object *could* be used for interstate commerce does not mean that the object is always used for interstate commerce. As a District Court in Tennessee said:

> If anything that will take you across a state line is an 'instrumentality of commerce,' then there is justification for Congress to regulate anything done on a bicycle or, for that matter, on foot. The Framers traveled to Philadelphia on horseback or by horse and carriage. Can it be imagined that in constructing the Commerce Clause they intended to regulate and punish horse stealing?

*United States* v. *Cortner*, 834 F. Supp. 242, 243 (M.D. Tenn. 1993).[3] The government would be hard pressed to identify any modern kidnapping that did not involve a motorized vehicle of some sort. Application of the Federal Kidnapping Act to an intrastate kidnapping because a car was involved would "make virtually every [kidnapping] in the country a federal offense." *Jones*, 529 U.S. at 859 (holding that federal arson statute could not apply to arson of residential buildings because such application would likely exceed the Commerce Clause).

---

[3] In *United States* v. *Cortner*, the district court held that the federal carjacking statute exceeded Congress's powers under the Commerce Clause, because a car is not necessarily an "instrumentality" of interstate commerce and because there was not a showing that carjacking had a "substantial effect" on interstate commerce. The Sixth Circuit later reversed and found the statute constitutional, but it did *not* hold that a car is necessarily an instrumentality of interstate commerce. Instead, it upheld the statute on the basis that Congress had a rational basis to believe that carjacking had a substantial effect on interstate commerce. *United States* v. *Osteen*, 30 F.3d 135 (6th Cir. 1994).

In *United States* v. *Mennuti*, 639 F.2d 107 (2d Cir. 1981), Judge Friendly rejected the government's aggressive interpretation of a statute prohibiting the destruction of any building "used in interstate or foreign commerce," which the government tried to apply to a private residence with only attenuated connections to interstate commerce.  The court held that even though the residence was "built in part with out-of-state materials," was "financed by a bank which engages in or whose activities affect interstate commerce," was "insured by a company engaged in such commerce," and was receiving "electric power and telephone service from companies engaged in or affecting commerce" — and *even if* the government showed that the "dwelling was advertised for rental, and that a lessee might come from without the state" — a residential building is not "used in interstate or foreign commerce." *Id.* at 110.  In reaching this decision, the court cited with approval *United States* v. *Monholland*, 607 F.2d 1311 (10th Cir. 1979), where the Tenth Circuit "declined to accept the Government's invitation to apply [federal law] to the destruction of a pick-up truck used by a state judge traveling to and from work, although the judge dealt with problems related to interstate commerce and drove the truck over the United States highway system," and even though "the pick-up truck or parts of it had been manufactured outside the state, used fuel brought in from other states or foreign countries, and was insured by a company having interstate business." *Mennuti*, 639 F.2d at 112.  A personal vehicle, like the pick-up truck in *Monholland*, and similar to the residence in *Mennuti*, is not an "instrumentality of interstate commerce" simply because it has the potential to be used for interstate commerce.

In fact, when Congress regulates motor vehicles, it does so explicitly.  The federal carjacking act makes it a crime to "take[] a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce."  18 U.S.C. § 2119.  The federal motor vehicle safety standards apply only to "motor vehicles and motor vehicle equipment in interstate com-

-12-

merce." 49 U.S.C. §§ 30101, 30112. And even in those statutes, Congress does not purport to regulate *all* cars, but only those shipped in interstate commerce. If a car were by definition an instrumentality of interstate commerce, the jurisdictional hooks that the motor vehicle had been "transported, shipped, or received in interstate or foreign commerce" or sold "in interstate commerce" would be superfluous.

    **B.**    **The "Use" of Any Purported Instrumentality of Interstate Commerce Was Too Attenuated From the Alleged Kidnapping to Create a Nexus to Interstate Commerce.**

Even if an instrumentality of interstate commerce were somehow involved in the alleged kidnapping, the Commerce Clause requires more than the casual presence of an instrumentality. The use must be of a level that creates a nexus between the alleged kidnapping and interstate commerce. Even if a car or a cell phone had a passing involvement in the alleged kidnapping, the involvement did not rise to the level of "use . . . in committing or in furtherance of the commission of the offense."

No Circuit Court has yet interpreted the amended jurisdictional provision in the Federal Kidnapping Act, but the few district courts that have considered the statute have required more than incidental use. *See United States* v. *Augustin*, 2010 WL 2639966, at *4 (E.D. Tenn. June 28, 2010) (holding that the amended Act "requires more than a mere 'incidental' use"). While defendants disagree that the alleged use in those cases was sufficient to connect the kidnappings to interstate commerce, the use in those cases still far exceeds the minimal contacts with interstate commerce alleged in the present case. For example, in *United States* v. *Jacques*, 2011 WL 1706765, at *1 (D. Vt. May 4, 2011), the kidnapper orchestrated an elaborate scheme, years in the making, in which he used a series of fake emails and MySpace pages to impersonate others, to manipulate unwitting accomplices, and to lure his victim; the entire scheme, until the snatching itself, was executed online. In *United States* v. *Ochoa*, 2009 WL 3878520, at *3

(D.N.M. Nov. 12, 2009), the connections to interstate commerce were more tenuous than in *Jacques*, but still not as remote as here — in *Ochoa*, the kidnapper had again sent a series of emails impersonating someone else to lure the victim. Using the internet to impersonate others and lay traps for unwitting victims at least touches upon an instrumentality (the internet) that crosses state and national lines and provides a network for commerce.[4]

Similarly, the Second Circuit has required that for the government to prove "use of a facility in interstate commerce" it has to show use "in a sufficiently meaningful way." *United States* v. *Archer*, 486 F.2d 670, 680 (2d Cir. 1973) (Friendly, J.). In *Archer*, the court held that an international phone call did not turn a local bribery scheme into a federal crime because the phone call was "a casual and incidental occurrence" that was "a matter of happenstance." *Id.* at 682-83. The court noted that "[t]he call served no purpose that would not have been equally served by a call from New York." *Id.* Similarly, in *United States* v. *Altobella*, 442 F.2d 310 (7th Cir. 1971), the Seventh Circuit held that the "use[] [of] any facility in interstate or foreign commerce" did not apply to "purely incidental" use of the mails — in that case, an extortion victim mailing his check from Philadelphia to his extorters in Chicago. *Id.* at 315. The court held that the statute required "a more significant use of a facility of interstate commerce in aid of the defendants' unlawful activity," and that because the defendants' "purpose would have been achieved equally well if the victim had borrowed $100 from associates at the hotel" as by mail-

---

[4] In *United States* v. *Augustin*, the connection with interstate commerce was the most attenuated of all. There, the victim was forced to use his cell phone, multiple times, to arrange for a transfer of money. 2010 WL 2639966, at *1. This sort of incidental contact with interstate commerce does not threaten any facility or instrumentality of interstate commerce and does not establish a sufficient nexus with interstate commerce to justify the exercise of Congress's commerce powers. Yet, even in *Augustin*, the phone lines have at least been held to constitute an instrumentality of commerce, and using the phones to arrange for money transfers is at least more essential to the kidnapping than merely driving a car. And even if the defendants possessed cellular telephones or used them in some incidental way, such calls would not have been essential to or have meaningfully facilitated the alleged kidnapping, and are not themselves enough to establish a connection to interstate commerce.

ing a check, the "minimal and incidental" use of the mails did not constitute a federal crime. *Id.* at 315.

Cars and cell phones are commonplace parts of everyday life in the modern world and they have incidental involvement in almost all activities. The Supreme Court recently considered what it means to use a telephone to "facilitate" a felony in the cell-phone age. *See Abuelhawa* v. *United States*, 556 U.S. 816, 822 (2009). The Controlled Substance Act makes it a felony "to use any communication facility in committing or in causing or facilitating" a felony drug distribution. *Id.* at 819. The government alleged that a defendant who used his cell phone to purchase drugs fell within the statute because the use of the cell phone "allow[ed] the transaction to take place more efficiently, and with less risk of detection, than if the purchaser and seller had to meet in person." *Id.* at 819. The Court rejected the government's interpretation, even though "on the literal plane, the phone calls could be described as 'facilitating' drug distribution." *Id.* It held that the statutory term "facilitate" was not satisfied by cell phone usage that simply "made the [drug] sale possible" or "made . . . distribution easier," especially "in these days when everyone over the age of three seems to carry a cell phone." *Id.* at 819, 822. In an age when cell phones and cars are commonplace tools that play incidental roles in almost every aspect of life, local crimes do not become federal crimes simply because such tools made a felony "possible" or "easier."

In contrast to statutes that prohibit the "use" of instrumentalities of interstate commerce, some statutes explicitly specify the precise "use" that is being prohibited. In *United States* v. *Giordano*, for example, the Second Circuit considered 18 U.S.C. § 2425, which prohibits the use of an instrumentality of interstate commerce to entice or solicit a child for sexual activity. 442 F.3d 30, 38 (2d Cir. 2006). That statute prohibits the "*transmission* of the name, ad-

dress, telephone number, social security number, or electronic mail address" of a child under sixteen. *Id.* (emphasis added). By criminalizing the "transmission" of information, the statute expressly connected phones and interstate commerce, and Congress was clear that the behavior alleged in *Giordano* — namely, the regular and continuous use of the phone lines to transmit information about and to entice young victims — fell within the scope of the statute. The Federal Kidnapping Act, in contrast, does not criminalize the mere transmission of information about a kidnapping victim — it criminalizes *kidnapping*. The use of phones would be incidental to kidnapping in a way it is not for transmitting information.

As in *Archer* and *Altobella*, the alleged kidnapping here has no connection to interstate commerce. The car "served no purpose that would not have been equally served" by the defendants leading the alleged victim to another location on foot, or waiting for the victim to come to them. *Archer*, 486 F.2d at 682. The presence of the car or of cell phones might have "made [the kidnapping] easier," *Abuelhawa*, 556 U.S. at 819, but transportation of the victim and communications with the victim or others are not essential parts of kidnapping. The use of a car to drive less than two miles or of cell phones was "minimal and incidental" to the alleged crime. *Altobella*, 442 F.2d at 315. The use did not threaten the safety and integrity of cars or the phone lines as a means of interstate commerce or otherwise create any nexus with interstate commerce. The presence of any instrumentality of interstate commerce was mere "happenstance," *Archer*, 486 F.2d at 682, and allowing such minimal connections to interstate commerce to create federal jurisdiction would result in almost every kidnapping becoming a federal crime. The minimal use of any purported instrumentality of interstate commerce in this alleged kidnapping did nothing to connect this local act with interstate commerce at a level that would justify federal intervention.

Here, where the presence of a car or a phone "is attenuated from the criminal conduct—the [kidnapping]—which occurs entirely locally," "the mere existence of jurisdictional language purporting to tie criminal conduct to interstate commerce" is not enough to make the prosecution constitutional. *Holston*, 343 F.3d at 89. Interstate commerce is too attenuated from the conduct being regulated here. There is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Morrison*, 529 U.S. at 618. Congress cannot upset the carefully crafted kidnapping laws that each of the fifty states has adopted to regulate kidnappings within their respective borders simply because cars or phones played some incidental role in an alleged kidnapping.

### III. Count Three Cannot Stand Without Count Two.

Count Three of the Indictment charges defendants with use of a firearm in furtherance of Count Two. If the Court dismisses Count Two, it must also dismiss Count Three.

### CONCLUSION

For the foregoing reasons, the prosecution of Mr. Soto and Mr. Ramos for an alleged kidnapping that occurred entirely within the state of New York and involved no significant use of any instrumentality of interstate commerce is not authorized under the United States Constitution. The Indictment must be dismissed.

Dated: December 21, 2012

WACHTELL, LIPTON, ROSEN & KATZ

By: __/s /__ David B. Anders
David B. Anders
Adam S. Hobson
Kim B. Goldberg
51 West 52nd Street
New York, New York 10019
(212) 403-1000
Email: DBAnders@wlrk.com
Email: ASHobson@wlrk.com
Email: KBGoldberg@wlrk.com

*Attorneys for Defendant Anibal Ramos*

FEDERAL DEFENDERS OF NEW YORK

By: _/s/ Jonathan Marvinny_
Jonathan Marvinny
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8700
Email: Jonathan_Marvinny@fd.org

*Attorney for Defendant Anibal Soto*